## GUERRIERO *v.* STATE

(Two Appeals in One Record)

[No. 198, October Term, 1956.]

546

*Decided June 6, 1957.*

The cause was argued before COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ., and KINTNER, J., Associate Judge of the Second Judicial Circuit, specially assigned.

*Harry Leeward Katz,* with whom were *C. John Serio* and *John Carroll Weiss, Jr.,* on the brief, for the appellant.

*Clayton A. Dietrich, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, J. Harold Grady, State's Attorney for Baltimore City,* and *James W. Murphy, Assistant State's Attorney,* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

Convicted by the court, sitting without a jury, of assault and carrying a deadly weapon, John Guerriero appeals from the judgment and sentence that followed, of one year suspended, and a fine.

The appellant claims here as he did below that necessity in the form of self-defense justified what he did. He, his brother Charles, and their father conduct a wholesale grocery business in Baltimore. One October evening Charles was parking the firm's truck on the one-way street in front of the store and, in backing, blocked the passage of the automobile of one Adams in which he was riding with his wife. After he had managed to pass, Adams stopped his car, got out and an altercation ensued that was verbal at first but soon developed physical aspects. The appellant's version of what occurred is that Adams had been drinking and used vile language to his brother, threw a wooden "horse" or trestle weighing fifteen or twenty pounds at the truck, and then with knife in hand walked "threateningly" towards the truck. Observing this, and fearing for his brother's safety, according to his testimony, appellant ran some fifteen feet to the front of the store, told his wife to call the police, went on into the store, picked up a pistol from under the counter, ran back out to where he had been standing, fired one shot into the air to frighten Adams and then a shot at the ground which ricocheted and went through Adams' ankle.

548

The prosecution's story of the fracas is that as Adams was protesting the blocking of traffic by the truck, with one foot in his car, which was seventy feet beyond the truck, and one foot on the ground, someone threw a piece of wood three or four feet long at him, which he managed to catch and throw back, that he had a penknife in his pocket but never had it in his hand, and that the appellant fired the shots without necessity or justification when Adams, without any intention of physical violence towards Charles, was standing some distance from the truck.

The printed record reveals a hopeless conflict in the testimony as to the distances involved, that is, how far Adams was from the truck when he threw the trestle or piece of wood, if he did, and how far away he was from the truck, and from the appellant, when the shots were fired. The trial court could well have found from the testimony that Adams threw the wood in an alcoholic pique at the truck, the offending inanimate object, that in the time that it took appellant to run twenty or twenty-five feet to get the pistol and twenty or twenty-five feet back that Adams had not advanced at all towards the truck, or had not advanced appreciably, that if Adams had a knife it had been tossed into his car which had been driven away before the police finished their investigation, although it was there when they arrived, that Charles Guerriero showed no signs of being in fear, or of anticipating serious bodily harm since he remained in the truck, did not roll up the windows of the cab nor drive or attempt to drive away, as he easily could have done, but merely continued his efforts to back his truck up to the curb as he had been doing when he blocked Adams' passage. The testimony in the record permitted the further finding that after Adams had been shot, he continued his verbal barrage at appellant and his brother but apparently made no effort to take physical action, and that when the police arrived the Guerriero brothers were just inside the door of the store and Adams and his wife were right at the door, where the verbal exchange was continuing, without real physical violence. The accusations and counter-accusations of the parties made it difficult for the police, when they arrived, to ascertain just what had happened.

The law of Maryland as to self-defense is clear. To justify an assault on the basis of self-defense, the accused must have had reasonable grounds to believe, and have in fact believed, himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant. This belief must coincide with that which would have been entertained under the same circumstances by a person of average prudence. *Winner v. State*, 144 Md. 682; *Baltimore Transit Co. v. Faulkner*, 179 Md. 598, 600; *Zell v. Dunaway*, 115 Md. 1, 6; *Turpin v. State*, 55 Md. 462; *Jenkins v. State*, 80 Md. 72. The same standards of belief and reasonableness apply in assault cases as in homicide cases. *Winner v. State, supra; Stockham v. Malcolm*, 111 Md. 615, 622. This is in accord with the rule of the majority of the States, that is, for the accused successfully to invoke self-defense, he must have done what he did to repulse an apparent danger of death or great bodily harm. A number of cases so holding are collected in an annotation in 114 A. L. R. 634. In Maryland it is for the trier of the facts to determine whether the accused was justified in meeting force with force. If justification be found to have existed, the force used must not have been "unreasonable and excessive", that is, must not have been more force "than the exigency reasonably demanded." *Baltimore Transit Co. v. Faulkner, supra.* A third person, closely related to or associated with one attacked in such a manner that he could properly have defended himself by the use of force, has a right to go to the defense of the person attacked and to use the same degree and character of force that the one attacked could have used. The cases differ as to whether, and under what circumstances, one may so defend a brother in danger but we assume, without deciding, that he may, since the State concedes the point.

Here the trier of the facts found that Adams was the aggressor in the affair but that the appellant went to unnecessary extremes without sufficient justification. Since it was the province of the trial court, sitting without a jury, to make this determination, under the rules we must conclude that his finding was "clearly erroneous" if the verdict is to be set aside. We think that the evidence was sufficient to sustain

the court's finding, first, that Charles was not in actual or apparent danger of his life or serious bodily harm, that he did not feel that he was and that John could not reasonably have believed that he was or thought he was; and, second, that in any event, the force used by John was excessive under the circumstances. The court found that appellant had fired in Adams' direction before he had reached the truck, and at a time when it was problematical whether or not he would have continued on towards the truck. On the first finding it is particularly pertinent that Charles made no attempt either to get out of the truck and go into the store or to drive off in the truck. We need not consider whether the oft quoted rule that the one attacked must have retreated to the first obstacle, such as a hedge, wall or ditch, is applicable here, because not driving off in the truck has significance, as does Charles' failure to roll up the windows of the cab or to get out of the truck on the pavement side and go into the store, as a circumstance to be considered with all others in determining whether the appellant went further on Charles' behalf than he was justified in doing. What Charles seemingly believed concerning Adams' conduct and how that belief apparently affected him is of vital importance in passing on the appellant's legal right to react to real or apparent danger to Charles in the manner he did. *Josey v. United States* (D. C.), 135 F. 2d 809; *Gant v. United States* (Mun. Ct. App. D. C.), 83 A. 2d 439.

Certainly, too, the court properly could have decided from the evidence, as he did, that the use of the pistol was unjustified to repel whatever danger there may have been to Charles. What Judge Henderson well said for the Court in the murder case of *Nixon v. State,* 204 Md. 475, 479, as to the claim that the killing was manslaughter only, is applicable here: "But the provocation must be great and the violence extreme to justify the use of a deadly weapon, and the question is usually one for the jury. * * * As bearing on the question of justification to repel the assault by the use of the pistol, the character and extent of the assault are important considerations, as to which the testimony is conflicting."

*Judgments affirmed, with costs.*