Gary Edward LAMB

v.

STATE of Maryland.

No. 186, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Dec. 5, 2001.

612

John C. Belcher, Oxon Hill, for Appellant.

Devy Patterson, Asst. Atty. Gen. (J. Jospeh Curran, Jr., Atty. Gen., Baltimore and Jack Johnson, State's Atty. for Prince George's County of Upper Marlboro, on the brief), for Appellee.

Argued before DAVIS, SALMON, EYLER, DEBORAH S., JJ.

DAVIS, J.

Appellant Gary Edward Lamb was charged with disorderly conduct, second degree assault, intentionally and knowingly

obstructing and hindering a police officer in the lawful performance of his duties, willfully failing to obey the reasonable and lawful order of a law enforcement officer, and resisting arrest. Appellant was tried in the Circuit Court for Prince George's County on December 11–12, 2000 by a jury. After the trial court granted the motion for judgment of acquittal by appellant's counsel as to the disorderly conduct count, appellant was convicted by the jury on the remaining four charges.

On February 2, 2001, appellant was sentenced to five years' incarceration, with all but two years suspended, for intentionally and knowingly obstructing and hindering a police officer in the lawful performance of his duties, ninety days' incarceration for willfully failing to obey the reasonable and lawful order of a law enforcement officer, and five years' incarceration, with all but two years suspended, for resisting arrest. All of the sentences were ordered to be served concurrently and the court merged the second degree assault conviction into the resisting arrest conviction.

Appellant files this timely appeal and presents three questions for our review, which we restate as follows:

I. Does the fact that a law enforcement officer attempted to effect an unlawful arrest preclude appellant's conviction for hindering and obstructing the officer in the performance of his duties and were appellant's responses to the officer's actions legally cognizable as proper defenses and to related charges?

II. Did the trial court err in refusing to either permit cross-examination of the arresting officer or instruct the jury as to the legality of the juvenile arrests that appellant was alleged to have hindered?

III. Did the prosecutor deprive appellant of a fair trial by making inflammatory comments during the closing argument in violation of an order *in limine?*

We conclude that the record is insufficient to answer appellant's first question and we answer his second question in the affirmative. We hold that he failed to preserve the third issue for our review, but address the issue for guidance of the lower

court on remand. We therefore reverse the judgments of the trial court and remand the case for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND

On the evening of December 31, 1999, Officer Paul Corridean stopped his police cruiser in front of 3702 Otis Street in Mount Rainier, Maryland, the home of Ralph and Rhea Quesenberry, parents of appellant, and confronted two juveniles sitting on the curb in front of the house.

At trial, the two juveniles were identified as appellant's half-brother and another juvenile ("T.F."); the two testified on behalf of appellant at trial. According to Officer Corridean, the two juveniles had open containers of alcohol between their feet as they sat on the curb. "T.F.," however, denied that he and appellant's brother were drinking anything. Officer Corridean then ordered the two juveniles to his police cruiser and proceeded to take the two into custody when appellant arrived at the scene. The facts as gleaned from the testimony of each party, from this point forward, differ sharply.

According to Officer Corridean, he attempted to handcuff the juveniles when appellant came from behind and pushed the officer hard on the right shoulder and asked, "What the fuck are you doing to my brother?" The officer then turned and ordered appellant to back up because the juveniles were under arrest at which point appellant stepped back in his stepfather's yard. Once in the yard, appellant "drew a line right at [sic] where the grass and the sidewalk meet" and said, "now I'm in my yard, motherfucker, or something to that effect."

When appellant first stepped back, Officer Corridean had not yet decided to arrest appellant. After appellant drew the imaginary line, Officer Corridean "instructed him a second time" to back away and appellant then made "some obscene gesture." Officer Corridean then told appellant that he was under arrest and then reached out to grab appellant. Appellant then "assaulted [Officer Corridean] a second time" by

"pushing off [Officer Corridean's] left hand." At that point, Officer Corridean "deployed [his] department pepper spray," at which time appellant began running through the yard.

After spraying appellant with the pepper spray, Officer Corridean called for back-up and pursued appellant to the front steps of the house, where a "second struggle" ensued, during which appellant punched him "three or four times." Officer Corridean responded to appellant's punches with a second shot of pepper spray. By this time, both juveniles had fled from the police cruiser. After deploying pepper spray a second time, one of the juveniles appeared and grabbed appellant and guided him around the left side of the house to the back entrance.

Shortly thereafter, when back-up forces had arrived on the scene, the officers saw appellant inside the house through the windows. The officers stood outside the house and yelled for appellant to come outside and turn himself in. After Officer Corridean removed his canine from the cruiser and gave two warnings for appellant to come out of the house, appellant "came down the stairs and surrendered, and . . . was taken into custody."

Testimony by appellant and his witnesses—juvenile "T.F.," Sally Ann Quesenberry, and Ralph Lee Quesenberry—differed sharply from that of Officer Corridean. According to appellant, on New Year's Eve 1999, he was visiting his parents' home to attend Midnight Mass with his family. When appellant arrived at his parents' home, he observed his younger brother in the street, being kicked in the side by Officer Corridean. Appellant asked Officer Corridean why he was kicking his brother, which caused Officer Corridean to make a gesture or say something indicating that appellant should back away. Appellant complied, stepping back into his parents' yard, after which time he repeated his question to the officer. Angered, Officer Corridean attacked appellant with his pepper spray, spraying him repeatedly in the face.

Appellant then proceeded up the back stairs to his parents' house into an upstairs bathroom, where he attempted to

ameliorate the effect of the pepper spray. As soon as he heard the police officers tell him he was under arrest, he came down the stairs to the front of the house and surrendered peacefully. All of appellant's witnesses watched Officer Corridean spray him with the pepper spray, but none of those witnesses observed appellant threaten or strike the officer or disobey his commands. Also, none of them heard Officer Corridean tell appellant that he was under arrest until appellant was upstairs in the home.

Prior to trial, appellant filed a motion *in limine* seeking an order prohibiting the State from referring to appellant's criminal history in opening statement, closing argument, or in its questions to witnesses, without prior approval from the trial court. The order sought also would require the State to instruct its police witnesses that they may not refer in any fashion to appellant's prior record, either on direct examination or under cross-examination, absent prior approval from the trial court, subject to the penalty of having their testimony stricken in its entirety. Should the State believe that appellant's criminal record, or any part thereof, has become relevant to some issue at trial, under the proposed order, the State must so inform the court and counsel for appellant in order to give appellant a fair opportunity to contest the admission of such evidence at a hearing to be held out of the presence of the jury. The court granted the *in limine* motion.

During cross-examination of Officer Corridean by appellant's counsel, the trial judge refused to allow appellant's counsel to inquire into the officer's belief as to the lawfulness of arresting the two juveniles. Following subsequent redirect examination of Officer Corridean, appellant's counsel made a proffer to the court regarding the questions he sought to ask the officer during cross-examination. During that proffer, appellant's counsel stated that he "was attempting to ask [Officer Corridean] about the lawfulness of the underlying arrest[s] of the juvenile[s]." The trial judge responded that "[t]hat's not a decision for [Officer Corridean].... We're not here on the arrest[s] of the juveniles. We're here on the other part."

At the conclusion of the State's case, appellant moved for judgment of acquittal on all counts and the trial judge denied the motion. After appellant presented his case, he renewed his motion for judgment of acquittal. In response, the trial judge granted the motion with respect to the disorderly conduct charge but gave no reason for his ruling.

Appellant's counsel submitted a proposed jury instruction on obstruction of justice and hindering a police officer. The trial court, however, refused to propound the proposed instruction in its charge to the jury and, instead, read a different version. Appellant's counsel excepted to the trial court's refusal prior to the reading of the jury instructions.

With regard to the charge of second degree assault, the trial judge instructed the jury as follows:

> The [appellant] is charged with the crime of assault. Assault is causing offensive, physical contact to another person. In order to convict the [appellant] of assault, the State must prove the following: that the [appellant] caused offensive, physical contact with or physical harm to Officer Corridean, that the contact was the result of an intentional or reckless act of the [appellant] and not accidental, and that the contact was not consented to by Officer Corridean or not legally justified.

During his closing argument, appellant's counsel stated:

> Officer Corridean put the dog in his face and said if he didn't shut up, he was going to have the dog attack him. That fits the same pattern with my client that Officer Corridean doesn't think people should have the first amendment right to express their opinions about dubious police conduct, and he will use force to repel that.

> Why does he do that? Why does he have to do that? Because he's a bully; because he's abusing his power, that is why. . . .

During the State's rebuttal closing argument, the following colloquy occurred:

[PROSECUTOR]: Want to know who the bully is? That is the bully right there. That is the bully. The man who steals people's cars with a deadly weapon, that is the bully, that [appellant]. ·

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Sustained. You are to strike that from your memory and not consider that comment in your deliberations in this case.

Following the trial judge's curative instruction, appellant's counsel made no further objection and did not request a mistrial, any further cautionary instruction, or any other relief.

## STANDARD OF REVIEW

█ In determining whether sufficient evidence was presented at trial to support a conviction, we will consider whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *See Pendergast v. State*, 99 Md.App. 141, 636 A.2d 18 (1994).

## LEGAL ANALYSIS

### I

Contending that the theory of the prosecution's case is flawed and the evidence presented at trial was insufficient to support his convictions, appellant posits:

This flaw comes from two undisputed facts: (1)[a]ll of the charges against [appellant] relate to his encounter with [Officer] Corridean in and around the property of [appellant's] parents on December 31, 1999[;] (2)[s]aid encounter arose entirely out of [Officer] Corridean's attempt to place [appellant's] younger brother and another juvenile under arrest for alleged Article 27 alcohol beverage violations.

These undisputed facts undermine the government's proof because [Officer] Corridean had no legal authority to arrest the juveniles in question for the possession of alcohol while being under the age of [twenty-one].

Appellant postulates that the charge of hindering and obstructing is the lynch pin upon which all of the remaining charges are predicated. But for the hindering charge, he intimates, there would have been no impetus for the subsequent actions of the two antagonists. In other words, the alleged unlawful conduct with which appellant was charged was causally related to the initial actions of Officer Corridean, unlike an officer's investigative role in the enforcement of laws which have already been violated. We begin by observing that it cannot be disputed that Officer Corridean's attempt to arrest the juveniles was in violation of Maryland law. We decide this case by answering the questions, "What constitutes 'lawful performance of a police officer's duties' and, where such performance is unlawful, what responses does the law recognize as justifiable?"

**A. Intentionally and Knowingly Hindering and Obstructing A Police Officer in the Lawful Performance of His Duties**

We are bound, in the present case tried to a jury, to take as true that version of the facts most favorable to the prevailing party in this case—the State. *State v. Funkhouser*, 140 Md.App. 696, 782 A.2d 387 (2001). Accordingly, we accept as true the following testimony of Officer Corridean:

[WITNESS]: There were two juveniles, one black male, one white male. They were positioned on the public sidewalk with a 22–ounce bottle of Miller Genuine Draft positioned between their feet.

. . .

[PROSECUTOR]: When you saw them with the beer, the 22–ounce Miller Genuine Draft—

[WITNESS]: Yes, sir.

[PROSECUTOR]:—what, if anything, did you do?

[WITNESS]: I got out of my car, instructed them to come to my vehicle.

[PROSECUTOR]: You pull[ed] up right on the curb, right next to them?

[WITNESS]: Yeah, about three feet from them.

[PROSECUTOR]: Okay.

[WITNESS]: Instructed them to come to my vehicle; told them they were both under arrest.

[PROSECUTOR]: Okay. And what happened next?

[WITNESS]: I placed them on my vehicle in between the sidewalk and my driver's side of the car, which is, I guess, about three feet between the curb and my vehicle.

[PROSECUTOR]: Did you instruct either or both of them to kneel?

[WITNESS]: One. I placed the black male on rollerblades on his knees because he had rollerblades and his feet would have slipped from under him and he would have fell [sic]. So I placed him on his knees.

[PROSECUTOR]: Okay. What about the other gentleman?

[WITNESS]: I believe he stayed on his feet.

[PROSECUTOR]: Okay. And did you talk to them before you made your decision to arrest them?

[WITNESS]: Just told them they were under arrest.

[PROSECUTOR]: Okay. And what were you going to do at that point?

[WITNESS]: I was going to handcuff them.

[PROSECUTOR]: All right. And what happened next?

[WITNESS]: Since I have a canine in my car I cannot transport, so I then called for another unit to come down to transport them so we could process them. As soon as I reached back to get my handcuffs, the [appellant], positioned to my right—I was unaware of him even approaching me—but then come back, pushed me in the back. I turned around.

. . .

[PROSECUTOR]: . . . You obviously were shoved in the back. You didn't see who shoved you?

[WITNESS]: No, I did not.

[PROSECUTOR]: Okay. Then what did you do?

[WITNESS]: Turned around. That's when he made the statement, ["W]hat the fuck's up with my brother[?"]. I said, ["Y]ou need to back up. They're under arrest.["]

[PROSECUTOR]: When you turned around and saw the person, who did you see?

Please describe him by an article of clothing and point to him.

[WITNESS]: The [appellant] positioned to my right, in the tan suit, dark hair.

. . .

[WITNESS]: I told him to back up; that they were under arrest.

[PROSECUTOR]: The juveniles were under arrest?

[WITNESS]: That's correct.

[PROSECUTOR]: Okay.

[WITNESS]: He stated, ["F]uck you.["] He drew a line with his foot. He said, ["N]ow I'm in my yard, mother-fucker,["] or something to that effect.

. . .

[PROSECUTOR]: All right. And so when he—you say he drew a line in the sand?

[WITNESS]: On the—like where the grass and the side-walk meet.

[PROSECUTOR]: All right. Now, when he did that did he back up into a yard, or did he just stay right there?

[WITNESS]: He was on the sidewalk. I was on the street. We were about two feet from each other. He took

about a foot step back and drew a line right at where the grass and the sidewalk meet.

[PROSECUTOR]: So he stepped off the sidewalk into the grassy part of the yard?

[WITNESS]: That's correct.

. . .

[PROSECUTOR]: All right. So then what happened next after he drew the line in the sand, on the grass?

[WITNESS]: I instructed him a second time. Like I said, he made some obscene gesture; said he was under arrest. And when I reached for him, he assaulted me a second time. He pushed off my left hand.

I deployed my department pepper spray, at which time he took off running through the yard. I've already told him he was under arrest.

So my attention was distracted from the two on my vehicle now. I went after him. He [was] running through the yard. And the two that were on my car that were supposed to be taken into custody, they then ran from my car.

Maryland Ann.Code (1996 Repl.Vol.), art. 27, § 400A prohibits the use and possession of alcohol by a person under the age of twenty-one, except under limited circumstances. Maryland Ann.Code (2001 Supp.), art. 27, § 402 sets forth the punishment for violations of § 400A. Section 402 provides, in pertinent part:

(a) *Person under 18.*—Any person under the age of 18 years who violates any provision of this subheading shall be issued a citation by a police officer authorized to make arrests and shall be subject to the procedures and dispositions provided in Title 3, Subtitle 8 of the Courts Article.

In *In Re Albert S.,* 106 Md.App. 376, 395–98, 664 A.2d 476 (1995), we held that, in the absence of any breach of the peace, a police officer's arrest of a minor for a violation of art. 27, § 400A was unlawful. In that case, the sole ground for the

arrest was the officer's belief that the appellant was a minor in possession of alcohol, an act prohibited by art. 27, § 400A. The suspect, a minor, resisted the officer's arrest and was charged with assault. In the proceedings in juvenile court, the appellant was found to be delinquent in that he committed an assault on the officer. In reversing the conviction, we held that

> [a] violation of § 400A is deemed to be a civil offense, [pursuant to] art. 27, § 403(a), and the maximum fine for a first-time offender is $500. Art. 27, § 403(f)(1). *At the time of the arrest, [the arresting officer] did not have probable cause to believe that any other offense had been committed. Consequently, the officer could do nothing more than issue a citation, art. 27, § 403(b)(1), and the arrest at issue here was unlawful.*

*Id.* at 395–96, 664 A.2d 476 (citation omitted).

In the case at hand, no evidence was presented that the two juveniles were breaching the peace when they were accosted by Officer Corridean. Further, Officer Corridean had no reason to believe that the two had committed another offense. After observing the two juveniles in violation of § 400A, Officer Corridean testified that he "[i]nstructed them to come to [his] vehicle [and] told them they were under arrest," at which point he attempted to handcuff the two juveniles. It was then, according to Officer Corridean, that appellant forcibly intervened.

In *Barrios v. State,* 118 Md.App. 384, 403, 702 A.2d 961 (1997) (citing *Cover v. State,* 297 Md. 398, 413, 466 A.2d 1276 (1983)), we set forth the elements of the crime of intentionally and knowingly obstructing and hindering a police officer in the performance of his or her duties—(1) a police officer engaged in the performance of a duty, (2) an act, or perhaps an omission, by the accused which obstructs or hinders the officer in the performance of a duty, (3) knowledge by the accused of facts comprising element (1), and (4) intent to obstruct or hinder the officer by the act or omission constituting element (2).

Appellant was charged with obstructing and hindering an officer in the *lawful* performance of his duties. In *Cover v. State, supra,* the Court of Appeals addressed the question of whether one is guilty of hindering when he or she alerts the target of an investigation or surveillance that a continued course of conduct may result in apprehension and prosecution. After discussing the quandary in attempting to draw a distinction between a warning given in order that the commission of a crime may be suspended while there is danger of detection and one which may be given in order that the commission of a crime may be postponed until after the danger of detection has passed, the Court reiterated the elements of the offense:

> The court set forth three questions which must be affirmatively answered to establish the offense: "(1) *Was there any obstruction of a constable?"; "(2) Was the constable acting lawfully in the execution of his duty?";* and "(3) *Was the obstruction intended to obstruct the constables in the execution of their dut[ies]?"*

*Id.* at 412, 466 A.2d 1276.

Moreover, in discussing what constitutes "duties," the Court of Appeals, in *Cover,* 297 Md. at 413, n. 6, 466 A.2d 1276 citing Gibbons, *The Offense of Obstruction: (Obstructing a Constable—The Emergence of a New Duty to Co–Operate With the Police* (1983) Crim. Law Rev. 21, 25, penned the view expressed in said treatise that

> [a]ll these duties [of an officer] are stated at a rather abstract level and do not stipulate particular courses of action so, *provided that the means adopted do not in themselves break the law,* it will be difficult to establish that any action taken by a constable is outside his [or her] duty. Indeed, because the constable's function is defined in terms of these general duties, doing what constables (usually police officers) *lawfully* do will be in the execution of his [or her] duty and this will encompass the practical lessons of effective policing drawn from experience and accumulated wisdom.

(Emphasis added.)

Based on the excerpt of Officer Corridean's testimony, his actions in arresting the two juveniles were unlawful.

Our decision in *Glover v. State*, 88 Md.App. 393, 594 A.2d 1224 (1991), is instructive as to intervention by a third party. In that case, we considered the right of a third party to intervene prior to the illegal arrest of a suspect. Answering Glover's claim that the officer's conduct was not within the scope of his duties, we said:

> Nor was appellant's hindering of the officer justified even if the underlying arrest was illegal. The crux of appellant's claim to the contrary is the argument that the officer, if making an illegal arrest, was not performing a duty. There is no Maryland law directly on point. It is clear, however, that a police "duty" sufficient to trigger a hindering charge need not be an arrest. Moreover, in *Sibiga v. State*, 65 Md.App. 69, 76, 499 A.2d 484 (1985)[,] we upheld a hindering conviction even though the defendant claimed that he had not hindered the police in the performance of any lawful duty. Sibiga obstructed and hindered police officers who, acting pursuant to a writ of possession, sought to evict him from his home. Because the effect of the writ had been stayed by the circuit court, Sibiga claimed it gave the officers "no legal right to move him from his house" and thus his resistance could not be hindering. Although we did not elaborate on the extent of police officers' "duty[,]" we concluded that there was "ample evidence" that the police were "engaged in the performance of a duty" in executing this writ.

(Citations omitted.)

Citing *United States v. Heliczer*, 373 F.2d 241 (2nd Cir.), *cert. denied*, 388 U.S. 917, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967), which considered a violation of 18 U.S.C. §§ 11 prohibiting resistance, opposition, or interference with federal agents while an agent is "engaging in . . . the performance of his [or her] official duties," we observed in *Glover*:

[A]ppellant assumes that the scope of the agents' official duties is co-extensive with their power to arrest. But this is not so.... "Engaged in performance of official duties" is simply acting within the scope of what the agent is employed to do. The test is whether the agent is acting within that compass or is engaging in a personal frolic of his [or her] own. It cannot be said that an agent who had made an arrest loses his [or her] official capacity if the arrest is subsequently adjudged to be unlawful.

*Glover,* 88 Md.App. at 405, 594 A.2d 1224 (citation omitted).

The *Glover* Court looked to decisions from several sister jurisdictions deemed to be instructive:

In *State v. Biller,* 5 Conn.App. 616, 501 A.2d 1218 (1985), *certif. denied,* 199 Conn. 803, 506 A.2d 146, *cert. denied,* 478 U.S. 1005, 106 S.Ct. 3296, 92 L.Ed.2d 711 (1986)[,] the court considered the precise question presented here, i.e., whether a police officer is performing an official duty, sufficient to support a hindering charge, when making an illegal arrest. The *Biller* court held that he was, reasoning that an officer is acting "in the performance of his [or her] duties" if he [or she] is "acting under a good faith belief that he [or she] is carrying out that duty, and if his [or her] actions are reasonably designed to that end." *Id.* 501 A.2d at 1220. "[T]he test is whether the officer is acting in good faith within the scope of his [or her] duties as an officer or is pursuing a personal intent or frolic of his [or her] own." *Id.* at 1221. *See also State v. Pembaur,* 9 Ohio St.3d 136, 459 N.E.2d 217, *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984) ("absent bad faith on the part of a law enforcement officer, an occupant of business premises cannot obstruct the officer in the discharge of his [or her] duty, whether or not the officer's actions are lawful under the circumstances."); *State v. Mulvihill,* 57 N.J. 151, 270 A.2d 277, 280 (1970) (an officer is "acting in the course of his [or her] duty, even though the arrest is illegal.").

*Glover,* 88 Md.App. at 405–06, 594 A.2d 1224 (footnote omitted).

In *Glover*, we held that a third party may not intervene to prevent the arrest of a suspect by a police officer, as long as the arresting officer is acting under a good faith belief that he or she has the authority to arrest the suspect and is not on his or her own "personal frolic". *Id.* at 406, 594 A.2d 1224 (citations omitted). Writing that the police officer "act[ed] in the performance of an official duty" at the time of appellant's intervention, we affirmed the trial court's convictions of Glover as to battery and hindering a police officer in the performance of his or her duties. *Id.* at 395, 594 A.2d 1224.

In *Glover*, we lifted from *State v. Biller, supra*, language of the Connecticut appellate court which provided guidance as to what constitutes "in the performance of [a police officer's] duties" upon a charge of interference with the officer in the performance of those duties. The interference charged had been the action of Biller in tearing up and secreting in his pockets a retainer for Biller's services as a public adjuster which authorized him to perform services in connection with a house fire. Two arson control inspectors had approached Biller upon observing the owner sign the retainer agreement and, believing that he was no longer licensed to act as a public adjuster, arrested Biller for acting as a public adjuster without a license. Citing its holding in *State v. Privitera*, 1 Conn.App. 709, 476 A.2d 605 (1984), the court concluded that

> "the legality of the police officer's conduct is not an element of the crime defined by General Statutes § 53a–167a(a), and that, in a prosecution under that statute to the extent that the [S]tate's case is based on the conduct of a police officer in making an arrest, by virtue of General Statutes § 53a–23 the illegality of that arrest is not a defense [to that charge]." Id., 719, 476 A.2d 605. But even more so here, the defendant's conviction pursuant to the same statute as in *Privitera* bears no fundamental relationship to the legality of his initial arrest. Rather, it is his conduct after arrest which supported this charge and is at issue.

*Biller*, 5 Conn.App. at 620, 501 A.2d 1218.

The appellate court of Connecticut ultimately recognized that whether the officer was acting in good faith was the

measure of whether he is acting "in the performance of his [or her] duties." The court based its decision on the fact that the legality of the officer's conduct is not an element of the crime under the relevant statute and that § 53a–23 of the Connecticut General Statutes provides that the illegality of the arrest is not a defense.

In *State v. Pembaur, supra,* also cited by us as illustrative of what constitutes acting "in the performance of [an officer's] duties," the Supreme Court of Ohio considered the claims of appellee, a medical doctor, and his receptionist, who had closed and barred the door leading from the reception area of the medical center to prevent two deputy sheriffs and two Cincinnati police officers from serving capiases upon two employees of the medical center for failing to appear before a grand jury. Citing its opinion in *Columbus v. Fraley,* 41 Ohio St.2d 173, 324 N.E.2d 735 (1975), the court held that in the absence of excessive or unnecessary force by an arresting officer, a private citizen may not use force to resist arrest by an authorized police officer engaged in the performance of his duties, whether the arrest is illegal under the circumstances. *Pembaur,* 9 Ohio St.3d at 138, 459 N.E.2d 217. Notably, the court's holding regarding specifically prohibiting interference with a police officer ostensibly performing his or her duties, is based on policy considerations recognized in *Fraley:*

> In altering the common-law rule granting a person the right to resist an unlawful arrest, the *Fraley* court deemed it preferable, considering the crunch of modern society, to resolve questions concerning the legality of police conduct in the courts through peaceful means rather than on the street in potentially violent confrontation. *Fraley* is determinative in the present case. Although defendant may well successfully challenge the use against him of any evidence obtained by the deputies in their search for defendant's employees, defendant was not privileged to physically impede the deputies in their attempt to locate the subjects of the capiases.

*Pembaur,* 9 Ohio St.3d at 138, 459 N.E.2d 217.

Notably, the *Pembaur* court's decision specifically turned on the court's finding that the facts of the case before it did not

demonstrate bad faith on the part of the deputies or any other circumstances which would justify the obstruction of the deputies in the discharge of their duties. Moreover, notwithstanding the policy consideration expressed by the Ohio Supreme Court, Maryland has not followed those states which have severely curtailed the right of self-help where one believes an officer has acted unlawfully.

The concerns articulated in *Biller* and *Pembaur* are representative of the rationale which undergirds the line of cases which restrict a citizen's right to interject himself or herself when an officer is engaged in discharging what is ostensibly his or her official duties. Prominently cited as a reason for restricting citizen challenges are state statutes in which the various legislatures, as a matter of public policy, have required that such challenges be resolved in a court of law. Whether citizen challenges to the legality of the performance of an officer's duties are restricted by statute or by court decisions, however, virtually all states have carved out the narrow exception for excessive or lethal force deemed to be unnecessary under the circumstances.

However mindful we may be of the reasoning upon which the authorities cited in *Glover* are anchored, these decisions, with respect to the materiality of the lawfulness of the arrest to sustain a conviction for hindering, involved determinations of such lawfulness subsequent to the arrest for hindering. For instance, in *Pembaur*, it was not until the Ohio Supreme Court determined that a third party, i.e., the proprietor of the medical center, was under a legal requirement to comply with the commands of the deputy sheriffs and the Cincinnati police that the lawfulness, *vel non*, was established as a fact. Likewise, the lawfulness of the actions of the arson control inspectors in *Biller* was ultimately determined by the Connecticut appellate court. Obviously, the determination of lawfulness becomes more problematic when it involves intricate calculations to determine the existence, *vel non*, of probable cause. Critical to our analysis herein is that the decisions limiting the right of citizens to challenge police actions generally involve

arcane laws or at least present a justiciable legal or factual controversy as to such lawfulness.

Although the *Glover* Court found *Heliczer* instructive on the question of "performance of official duties," there, the Second Circuit reviewed a federal statute which explicitly prohibited "resistance, opposition, or interference" with federal agents engaged in the performance of their duties. In *Glover,* we attempted to extrapolate the narrow precept that a law enforcement officer engaged in a personal frolic, rather than acting in an official capacity, would be deemed not to be acting in the lawful performance of his or her duties. The thread running through the authorities cited by the *Glover* Court was the good-faith belief that the officers were carrying out duties within the scope of their authority.

Decisions expounding upon the concept of what constitutes good faith on the part of an officer discharging his or her official duties generally speak in terms of a "reasonably well-trained officer" and emphasize that "good faith" is to be measured by an objective standard by which an officer is charged with the knowledge of the law, even if he or she is insulated by an impartial prior judicial determination. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Moreover, a distinction is drawn between police action in good faith reliance on a substantive criminal statute that is subsequently declared unconstitutional. *Id.* at 912, 104 S.Ct. 3405. Thus, a police officer with knowledge—or who may be charged with the knowledge—of existing law later overturned or found to be unconstitutional and one who acts pursuant to a prior judicial determination by a magistrate or impartial judicial officer are less likely to be viewed as acting in bad faith than one who seeks to enforce existing law which governs the officer's actions under the circumstances presented. The case *sub judice* falls within the latter category.

The line of cases emanating from the United States Supreme Court that discusses immunity of police officers and other public officials and the exclusionary rule in the context of what constitutes good faith are instructive. Because the

issue here involves liberty as opposed to protecting public officials from personal liability, the standard should be higher than that set in the civil qualified immunity cases. Moreover, in *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) and *Leon*, the Supreme Court refused to extend the good faith exception to officers who either knew their actions were illegal or were chargeable with the knowledge that they were performing their official duties in an unlawful manner. Concluding that the petitioner is not automatically insulated from civil liability because his action in applying for a warrant is *per se* objectively reasonable and because he is entitled to rely on the judgment of a judicial officer in finding that probable cause exists in issuing the warrant, the Supreme Court concluded, in *Briggs*, 475 U.S. at 345, 106 S.Ct. 1092:

> In *Leon*, we stated that "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization. The analogous question in this case is whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. If such was the case, the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest. It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should. We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment.

(Footnotes omitted.)

■ Thus, from the foregoing, even when there has been a prior legal determination by a magistrate or judicial officer, an officer is not absolved of his or her duty to exercise professional judgment consistent with his or her training when acting under color of law. Additionally, he or she must also

avoid taking any actions in furtherance of personal reasons or ulterior motives. Obviously, in the case *sub judice,* the testimony of Officer Corridean makes clear that he knew the two individuals that he was arresting were juveniles. We cannot know, from the record before us, whether Officer Corridean was aware that his actions in placing the two juveniles under arrest were unlawful because the lower court precluded appellant's counsel from asking questions in that regard.

To be sure, appellant's counsel attempted to offer evidence which would have called into question Officer Corridean's knowledge of the law relating to issuance of citations to minors in possession of alcoholic beverages. He also attempted to inquire whether Officer Corridean's actions on the day in question were the actions of a "reasonably well-trained officer" and, in turn, whether he acted in good faith in attempting to arrest the two juveniles.

Officer Corridean responded in the affirmative when asked, "In regard to the third charge, when you say that he knowingly—intentionally and knowingly obstructed and hindered you from the lawful performance of your duties, you were referring to your attempt to arrest the juveniles. These were the duties that he was attempting to interfere with?"

Despite Officer Corridean's unequivocal acknowledgement that he sought to arrest the two juveniles, the trial court declared that it could not discern the officer's intent because of appellant's actions:

> Whether or not the officer was either going to issue a citation in a civil process matter with respect to the two juveniles, or whether the officer was going to arrest them, as he indicated he was, the [appellant's] actions and comments prevented him at that point in time from doing either. And since they didn't cease, whether it was a civil process or citation or whether it was an arrest isn't known.

It may well be that the trial judge, having concluded that appellant acted precipitously, felt there was no need to consider the legal implications of arresting the juveniles rather than issuing citations.

■ From the foregoing, it is clear from the testimony of Officer Corridean that his actions in attempting to effectuate an arrest of the juveniles were unlawful. The inquiry into Officer Corridean's knowledge of § 400A requiring that juveniles be issued citations for violations of the alcoholic beverages law should have been allowed. Moreover, given the officer's apparent prior history with the two juveniles, it was legitimate for appellant's counsel to attempt to elicit evidence that Officer Corridean was not acting in good faith, but rather out of a personal motive. Counsel had attempted to pursue the line of questioning regarding the officer's knowledge of the law despite his acknowledgement that he attempted to arrest the two juveniles. Had that inquiry proceeded to its conclusion, any acknowledgement by Officer Corridean that he knew his actions were unlawful, or any evidence adduced that the performance of his duties was below the standard of a "reasonably well-trained officer," would have negated any finding that he acted in good faith.

In sum, the unique facts of the instant case compel the conclusion that appellant was entitled to elicit evidence in support of his claim that Officer Corridean was not engaged in the lawful performance of his duties when he interceded. No subsequent judicial determination of the existence, *vel non*, of probable cause to support a warrantless arrest or a warrant is involved here. Nor did Officer Corridean act pursuant to a statute later found to be unconstitutional or otherwise found to be invalid. And, unlike *Glover*, where appellant's mother had not yet been arrested by the officer when appellant intervened, Officer Corridean, in the case at hand, explicitly testified that he was in the process of handcuffing the two juveniles when appellant interceded. Dispositive of appellant's claim that he should be entitled to challenge whether the officer was acting within the lawful performance of his duties is the acknowledged unlawfulness of Officer Corridean's actions coupled with the elemental nature of the duty illegally performed. We hold that the trial court erred in refusing to allow appellant to inquire into Officer Corridean's training and knowledge of the law in question and any other ulterior motive

the officer may have had as such fact may tend to establish bad faith.

■ We hasten to add that this holding is applicable to the unique facts of this case. Simply put, the threshold permitting the inquiry in this case was crossed because the officer failed to discharge properly the most basic of ministerial tasks, i.e., the issuance of citations, putting in motion a chain of events, which led to these proceedings. There is no entitlement to an inquiry regarding an officer's potential bad faith unless an appellant can proffer objective evidence of an improper motive, including the patent illegality of the officer's actions.

■ Because the trial court foreclosed all attempts by counsel to delve into the officer's motivation and unlawfulness of his attempted arrests, we reverse the judgment of conviction for obstructing and hindering an officer in the performance of his duties and remand the case to the circuit court for retrial. On remand, whether Officer Corridean knew or should have known that his actions were not lawful and whether they constituted those of a "reasonably well-trained officer" are, in the first instance, for the trial judge to pass on as a matter of law. A finding that Officer Corridean knew his actions were unlawful and proceeded in spite of that illegality would support a finding that he did not act in good faith as a matter of law.

■ Whether a reasonably well-trained officer could be charged with the knowledge of art. 27, § 400A and whether the other actions of Officer Corridean surrounding his attempt to arrest the two juveniles were those of a reasonably well-trained officer must be submitted to the jury, only in the event that sufficient evidence is elicited to support appellant's theories and further provided that the issues are not decided by the lower court as a matter of law.

## B. Second Degree Assault

In *Ott v. State,* 11 Md.App. 259, 265, 273 A.2d 630 (1971), we defined common law assault as

any attempt to apply the least force to the person of another. The attempt is made when there is any action or conduct reasonably tending to create apprehension in another and that the person engaged therein is about to apply such force to him. An apparent intention to inflict a battery and an apparent ability to carry out such intention is sufficient. A specific purpose to inflict a particular injury is not necessary. General malevolence or recklessness is sufficient; but mere negligence does not suffice.

(Citations omitted.)

The proscription of Md.Code Ann., art. 27, § 12A provides that Second Degree Assault is a misdemeanor, punishable by not more than ten years' imprisonment or a fine of not more than $2,500 or both.

The force employed, according to the testimony of Officer Corridean, consisted of an initial push on the right shoulder of the officer, a "pushing off" [Officer Corridean's] left hand as he attempted to grab appellant," and three or four punches thrown by appellant after Officer Corridean had "deployed [his] department pepper spray" and was subsequently attempting to subdue appellant.

In considering appellant's assault conviction in *Glover, supra,* we recognized that a person has the right to intervene with force in the defense of another person subject to an unlawful arrest. We held, however, that,

where the use of force is authorized, the force used may only be that which is reasonably demanded by the situation. *An intervenor, acting under a right to assist, is judged "on his own conduct, based upon his own observation of the circumstances as they reasonably appeared to him." Thus, appellant could not legally use more force than was reasonably demanded by the circumstances he faced.*

*Id.* at 403, 594 A.2d 1224 (citations omitted).

In *Glover,* we upheld appellant's conviction of battery, because his mother had not yet been arrested by the officer; appellant, therefore, was not justified in using *any* force to intervene. *See id.* at 403–04, 594 A.2d 1224.

Applying the reasoning of *Glover*, whether Officer Corridean had effected an arrest of the two juveniles prior to appellant's intervention is critical to our analysis. In *Bouldin v. State*, 276 Md. 511, 515–16, 350 A.2d 130 (1976)(citing 5 Am.Jur. 2D *Arrest* § 1 (1962)), the Court of Appeals held that an arrest is generally recognized as

the taking, seizing, or detaining of the person of another (1) by touching or putting hands on him [or her]; (2) or by any act that indicates an intention to take him [or her] into custody and that subjects him [or her] to the actual control and will of the person making the arrest; or (3) by the consent of the person to be arrested.

*Accord State v. Evans*, 352 Md. 496, 513, 723 A.2d 423, *cert. denied*, 528 U.S. 833 (1999). In this case, by his own admission, Officer Corridean had announced his intention to arrest the two juveniles and was in the process of handcuffing them when appellant interceded.

Our analysis of whether the evidence is sufficient to sustain appellant's conviction for assault, in the first instance, devolves upon the interplay between assault and the legitimacy of the flagship offense of hindering and obstructing. Appellant's entitlement to raise the defense that he properly intervened to prevent an unlawful arrest is predicated upon a finding that the evidence demonstrates the arrest was unlawful. A finding that the hindering and obstructing conviction is unsustainable would require a further determination that the force used to repel the illegal actions of Officer Corridean was reasonable. That determination is within the province of the fact finder, in this case—the jury. Accordingly, we are constrained to vacate appellant's convictions for assault.

At the time appellant intervened by pushing the officer's shoulder, he had arrested the two juveniles. According to Officer Corridean's testimony, appellant assaulted him two more times following the initial confrontation. Each of the two assaults was in response to Officer Corridean's attempts to arrest appellant. The effect of those alleged assaults is discussed, *infra*, in Part I D., in the context of resisting arrest.

The reasonableness of force must be determined by whether only that necessary to repel the force directed at him was employed by appellant, an issue which must be resolved by the jury.

■ In light of our discussion, *supra*, the trial court erred in its jury instruction as to assault. In addition to providing the elements of assault, the court should have instructed the jury, in weighing the evidence, to determine whether the initial force applied to prevent the arrests of the juveniles was reasonable. The court should then have instructed the jury to determine whether the force employed by appellant was unreasonable, i.e., more than the force necessary to repel Officer Corridean's attempt to grab him and, thereafter, to subdue him.

### C. Willfully Failing To Obey the Reasonable and Lawful Order of a Law Enforcement Officer

Maryland Ann.Code (2001 Supp.), art. 27, § 121 sets forth this crime, stating, in pertinent part:

(b) Disorderly conduct.— ... (3) A person may not willfully fail to obey a reasonable and lawful order of a law enforcement officer made to prevent a disturbance to the public peace.

The State argues that appellant's conviction on this charge should be affirmed because appellant, "in contradiction of [Officer Corridean]'s repeated orders, refused to withdraw himself from the scene so the officer could do his lawful duties with respect to the two juveniles."

When examined with respect to appellant's actions that constituted failing to obey the lawful order of a law enforcement officer, Officer Corridean testified:

[APPELLANT'S COUNSEL]: In regard to the fourth count, this is that he willfully failed to obey a reasonable and lawful order of yourself, you said, to wit: failed to leave and to prevent a crowd.

Now, your testimony today did not indicate, on direct, that you even told him to leave, did it?

[WITNESS]: No, sir.

[APPELLANT'S COUNSEL]: And your testimony today did not indic[a]te that you told him he should try to prevent a crowd did it?

[WITNESS]: I'm sorry. Say that again, sir.

[APPELLANT'S COUNSEL]: Based on your testimony during direct examination today, you did not say anything about ordering my client at any time that he should do something to prevent a crowd from gathering, did you? That was not part of your testimony?

[WITNESS]: No, sir.

Later, on redirect examination, Officer Corridean provided the following testimony:

[PROSECUTOR]: Failure to obey a reasonable and lawful order of a police officer in the performance of his duties, what led you to that charge?

[WITNESS]: When he failed to step away, remained at the scene, continued to cause a disturbance, you know, just incite this into escalating, that didn't need to happen.

. . .

[WITNESS]: He was on the sidewalk. I was on the street. We were about two feet from each other. He took about a foot step back and drew a line right at where the grass and the sidewalk meet.

[APPELLANT'S COUNSEL]: So he stepped off the sidewalk into the grassy part of the yard?

[WITNESS]: That's correct.

[APPELLANT'S COUNSEL]: Do you know why he did that?

[WITNESS]: I have no idea.

■■■■ It appears that the only command of Officer Corridean was for appellant to step back, which he did. According to the officer's testimony, it was at the point in time when appellant made an obscene gesture when the officer decided to

place him under arrest. Regardless of how insulting, in the absence of any aggressive action constituting an assault or incitement, an obscene gesture furnishes no basis upon which to arrest for failure to obey a lawful order made to prevent a disturbance to the public peace.[1] From our review of the record before us, Officer Corridean ordered appellant to step away, but never issued an order for him to leave the scene. It should be noted that appellant withdrew from the public sidewalk to his parent's property and that there was no evidence of a gathering crowd during the confrontation. Hence, there could be neither a disturbance of the public peace nor an obstruction of the free passage of pedestrians or others in a public place or on a public conveyance pursuant to art. 27, § 121. Given the state of the record, the count charging willful failure to obey the lawful order of an officer should not have been submitted to the jury, but rather should have been dismissed upon appellant's motion for judgment of acquittal. Consequently, we reverse the judgment of conviction on this count and order that a judgment of not guilty be entered.

## D. Resisting Arrest

Maryland follows the long-standing common law privilege permitting persons to resist an illegal warrantless arrest. After discussing the public policy considerations, the Court of Appeals penned in *State v. Wiegmann,* 350 Md. 585, 606–07, 714 A.2d 841 (1998):

We believe the points raised by petitioner have merit. We cannot say, however, that the right to resist is unsound or unsuitable to a modern society. Were we to abrogate the common law rule, the only remaining remedies for an

---

1. See *Diehl v. State,* 294 Md. 466, 471, 451 A.2d 115 (1982) (holding violent, abusive epithets, absent circumstances wherein so-called "fighting words" tend to incite, do not support a conviction for disorderly conduct under art. 27, § 121; "one man's vulgarity may well be another man's vernacular.") *See also Briggs v. State,* 90 Md.App. 60, 72, 599 A.2d 1221 (1992), and *Reese v. State,* 17 Md.App. 73, 82, 299 A.2d 848 (1973).

unlawful arrest would be release followed by a civil or criminal action, such as an action for false imprisonment. We have said that such remedies may be inadequate. *Rodgers [v. State]*, 280 Md. [406], 421, 373 A.2d [944], 952 [ (1977) ].

Furthermore, the Legislature is presumed to be cognizant of the holdings of our cases, including *Rodgers,* which was decided over twenty years ago. Even though we have criticized several aspects and outcomes of the application of the right to resist, the Legislature has failed to respond to this criticism as it has yet to alter or abolish the common law privilege in spite of the period of time this issue has been discussed in our cases. . . .

. . .

Accordingly, we decline to abolish the long-standing common law privilege *permitting* persons to resist an illegal warrantless arrest. We believe this change is best left to the Legislature and its primary power to, in the first instance, declare the public policy of this state.

It is well settled that a person subjected to an illegal arrest may resist such an arrest using any reasonable means, including force, to effect his or her escape. *See Barnhard v. State,* 325 Md. 602, 614, 602 A.2d 701 (1992)(citing *Williams v. State,* 204 Md. 55, 64, 102 A.2d 714 (1954)).

Assuming a determination, on remand, that Officer Corridean's violation of § 400A constituted action in contravention of the lawful performance of his duties, whether appellant is guilty of resisting arrest depends on the jury's determination as to the reasonableness of appellant's initial actions in intervening to prevent the arrests of the juveniles.[2] A finding that appellant's initial force was unreasonable would result in sustaining appellant's convictions for second degree assault and

---

**2.** A jury may well find that a "push on the [officer's] right shoulder" was unreasonable whereas verbally challenging Officer Corridean's authority to arrest the two juveniles or physically coming between the officer and the two juveniles would have been reasonable.

resisting arrest. Upon a finding that the initial actions used were reasonable, the jury must also determine whether appellant's subsequent use of force to resist arrest was reasonable, under the circumstances.

## II

Appellant argues that the trial court erred in refusing to permit cross-examination of the arresting officer, regarding his personal belief as to the legality of his arrest of the two juveniles. The following transpired when appellant attempted to elicit testimony with respect to the legality of the juveniles' arrests:

[APPELLANT'S COUNSEL]: Sir, you stated that you put these juveniles under arrest. You understand the differences, don't you, as an officer who went to some sort of training academy, between a citeable civil offense—

[PROSECUTOR]: Objection.

THE COURT: Sustained. This trial is not going astray. I want you to limit your questions to the case at hand, the factual scenario of what we have. All right, sir.

[APPELLANT'S COUNSEL]: Sir, one of the offenses that is—that you recommended in your report bringing against my client is that he interfered with the lawful— with you in the lawful performance of [your] duties, right?

[OFFICER CORRIDEAN]: Yes, sir.

[APPELLANT'S COUNSEL]: And the lawful performance of [your] duties that you just testified about was [your] arresting the two juveniles, right?

[OFFICER CORRIDEAN]: Yes, sir.

[APPELLANT'S COUNSEL]: Isn't it true that you knew you did not have the authority to arrest those juveniles?

[PROSECUTOR]: Objection.

THE COURT: Sustained.

. . .

[APPELLANT'S COUNSEL]:.... I was attempting to ask him about the lawfulness of the underlying arrest of the juvenile[s].

THE COURT: That's not a decision for him.

[APPELLANT'S COUNSEL]: Well, I don't think—I mean, his belief is. If it's not—

THE COURT: Why—we're not here on the arrest of the juveniles. We're here on the other part.

[APPELLANT'S COUNSEL]: No, but in order to say—if you are saying that's going to be a legal decision as to whether it's lawful or whether it's probable cause, then I would rest there. But it seems to me that it goes to his motive, if he really believed that he had ground[s] to arrest him. I mean, we're saying he didn't. He knew that he didn't have any grounds to arrest him. He did it anyway.

THE COURT: Okay.

[APPELLANT'S COUNSEL]: Because it was just a civil citation, and that's not an arrestable offense.

Appellant's counsel was obviously attempting to establish whether Officer Corridean knew that he was required under Maryland law to issue a citation to the juveniles for the offenses in question. In fact, before the objection was sustained, he had attempted to elicit the nature of the officer's training and whether, as a result of that training, he knew the difference "between citeable and civil offense." More specifically, Officer Corridean acknowledged that the charge of interfering with the lawful performance of his duties was based on appellant's actions when he attempted to arrest the two juveniles. The lower court dismissed counsel's efforts by, in essence, deciding that the arrests of the juveniles was not relevant.

Concomitant with our prior discussion in Section I, A, *supra*, counsel attempted to argue to the court that whether the officer's actions were lawful or based on probable cause

was relevant to the question of whether he knew he had a proper basis to arrest the juveniles and to his ultimate motive.

As we have previously concluded, all of these matters were relevant and pertinent to whether the conviction for hindering and obstructing an officer in the lawful performance of his duties was sustainable. Concomitant with our decision to remand this case, should counsel seek to produce the relevant evidence, the lower court is directed to allow counsel to elicit testimony to establish (1) Officer Corridean's knowledge of the provisions of art. 27, § 400A, i.e., citations must be issued to juveniles charged with violations of the alcoholic beverages law, (2) the training and education received by Officer Corridean relative to existing statutes he is required to enforce, (3) any other facts bearing on standards with which he should have complied which would have made knowledge of the laws at issue chargeable to him, and (4) any other evidence bearing on Officer Corridean's motive or possible ulterior purposes in attempting to effect the arrest of the two juveniles.

## III

Appellant argues that the State's Attorney deprived him of a fair trial by making inflammatory comments during the closing argument, in violation of an order *in limine*. The State counters that appellant failed to preserve the issue for appeal. We agree.

In *Hairston v. State,* 68 Md.App. 230, 236, 511 A.2d 73, *cert. denied,* 307 Md. 597, 516 A.2d 567 (1986), we held that, "[w]here an objection to opening or closing argument is *sustained,* . . . there is nothing for this Court to review unless a request for specific relief, such as a motion for a mistrial, to strike, or for further cautionary instruction is made." (Citation omitted.) In *Hairston,* we distinguished this holding from a situation in which the trial court overruled the objecting party's exception; in that situation, the objecting party's overruled exception would preserve the issue for appeal. *See id.*

In the case *sub judice*, appellant's counsel objected to the State's remarks during closing argument; the trial judge sustained that objection and then promptly gave the jury a curative instruction. Thereafter, appellant's counsel did not make a motion for mistrial, or to strike, or for a further cautionary instruction. Pursuant to *Hairston*, appellant did not properly preserve this issue for appellate review. On remand, however, we believe the prosecutor would be ill advised to re-present the argument objected to herein.

**CONVICTIONS FOR OBSTRUCTING AND HINDERING POLICE OFFICER IN LAWFUL PERFORMANCE OF HIS DUTIES, SECOND DEGREE ASSAULT AND RESISTING ARREST VACATED.**

**CONVICTION FOR FAILURE TO OBEY THE LAWFUL ORDER OF A LAW ENFORCEMENT OFFICER REVERSED.**

**CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ONE–FOURTH BY APPELLANT AND THREE–FOURTHS BY PRINCE GEORGE'S COUNTY.**